AO106(Rev.5/85) Affidavit for Search Warrant

# UNITED STATES DISTRICT COURT
## FOR THE DISTRICT OF COLUMBIA

In the Matter of the Search of
(Name, address or brief description of person, property, or premises to be searched)

**U.S. Department of Education
550 12th Street, SW
9th Floor cubicle office designed as Room 9094
Potomac Center Plaza
Washington, D.C.** 20202

(Further described below)

## APPLICATION AND AFFIDAVIT
## FOR SEARCH WARRANT

CASE NUMBER:

I _____**Robert Donald Mancuso**_____ being duly sworn depose and say:

I am a(n) _____**Special Agent with the United States Department of Education-OIG**_____ and have reason to believe
(Official Title)

that ☐ on the person of or ☒ on the property or premises known as   (name, description and or location)

**U.S. Department of Education, 550 12th Street, SW, 9th Floor cubicle office designed as Room 9094, Potomac
Center Plaza, Washington, DC 20202,** including any locked or padlocked rooms within **and/or the person of George
Altiery. (as further described in "Attachment A", which is attached hereto and fully incorporated herein by
reference)**

in the District of Columbia, there is now concealed a certain person or property, namely (describe the person or property to be
searched) **(as further described in "Attachment B", which is attached hereto and fully incorporated herein by
reference)**

which is (state one or more bases for search and seizure set forth under Rule 41(b) of the Federal Rules of Criminal Procedure)
**evidence and instrumentalities.**

concerning a violation of Title __**18**__ United States Code, Section(s) **§§ 1030 & 641.** The facts to support a finding of
Probable Cause are as follows:

**SEE ATTACHED AFFIDAVIT HEREIN INCORPORATED BY REFERENCE AS IF FULLY RESTATED
HEREIN**

Continued on the attached sheet and made a part hereof.    ☒ YES   ☐ NO

Sherri Schornstein
Fraud and Public Corruption
(202) 514-6956

Sworn to before me, and subscribed in my presence

_____
Date

_____
Name and Title of Judicial Officer

_____
Signature of Affiant
Robert Donald Mancuso,  Special Agent
U.S. Department of Education-OIG

at Washington, D.C.

_____
Signature of Judicial Officer

## AFFIDAVIT IN SUPPORT OF SEARCH WARRANT

I, ROBERT DONALD MANCUSO, being duly sworn, depose and say:

1.  I am a Special Agent with the United States Department of Education (hereinafter, ED), Office of Inspector General (hereinafter, OIG). I have been a Special Agent with the ED-OIG for approximately four years and five months, and have served as a Criminal Investigator in the United States Government for nine years.  I am assigned to the investigation of white-collar crimes involving ED programs and resources, and in particular to the investigation of crimes involving computer fraud, abuse and network intrusions. For approximately the last six years, I have been a computer forensic examiner and have been trained and participated in searching for and analyzing digital evidence stored on computers. I am currently the Supervisory Special Agent for the Technology Crimes Division (hereinafter, TCD).

2.  During my career as a Special Agent, I have participated in several investigations involving computer-related offenses, and have participated in the execution of several search warrants involving the searches and seizures of computers, computer equipment, software, and electronically stored information.  I have interviewed numerous persons involved in the unlawful use of computers to commit fraud against ED programs, and have analyzed computer hardware and software recovered during the execution of search warrants. Additionally, I have received both formal and informal training in the field of computers and network intrusions from the Federal Law Enforcement Training Center, Guidance Software and various forensic and network intrusion training providers.

3.  I am the case agent for an investigation involving the exceeding authorized access and theft of government property by George ALTIERY (hereinafter, ALTIERY), Senior Manager,

Lead Service Delivery Manager, Computer Sciences Corporation, Inc. (hereinafter, CSC).  I base this affidavit upon my training, experiences, personal knowledge, my review of related digital and documentary evidence, my discussions with officials knowledgeable with the ED Information Technology (hereinafter, IT) network infrastructure, my involvement in the discussions and events more particularly described below, and the knowledge of other law enforcement officials and reliable witnesses involved in the investigation.  This affidavit contains only facts necessary to establish probable cause and does not include all of the information collected to date.

4.  This affidavit is made in support of an application for a search warrant for items at the following location:

> **Location to be Searched:**  U.S. Department of Education, 550 12th Street, SW, 9th Floor cubicle office designated as Room 9094 in Potomac Center Plaza (hereinafter, PCP), Washington, DC 20202.  The cubicle is currently shared by ALTIERY and another CSC contractor who is unrelated to this investigation.  The location is more fully described in Attachment A of this Affidavit.

> **Items to be Searched:**  Items fully described in Attachment B.

5.  This request is based upon evidence in support of violations of Title 18 United States Code (hereinafter, U.S.C.) Sections 1030 (Exceeding Authorized Access), and 641 (Theft of U.S. Government Property).  The evidence, fruits and instrumentalities believed to be located within the location to be searched are set forth in Attachment B of this affidavit.

## APPLICATION PURPOSE

6.  TCD is conducting an investigation into the potential criminal activities of ALTIERY, Senior Manager, Lead Service Delivery Manager, CSC and Monrovia JACKSON (hereinafter,

JACKSON), Service Delivery Management Functional Coordinator, CSC.

7.  On February 23, 2007, Lannie ELDERKIN (hereinafter, ELDERKIN), Acting General Counsel for CSC contacted ED's Office of General Counsel and advised that JACKSON and ALTIERY had inadvertently discovered files located in an Office of Chief Information Officer (hereinafter, OCIO) network folder on February 21, 2007.  While JACKSON was moving files around relating to an approved and planned ED computer system upgrade, she located documents relating to an upcoming Request for Proposal (hereinafter, RFP).  After locating the files, she alerted her supervisor, ALTIERY, to this information.

8.  A RFP is an invitation for suppliers or contractors, through a bidding process, to submit a proposal on a specific product or service.  Generally, the RFP involves the price at which the supplier can perform the service, as well as basic corporate information, financial information, and technical capability.  Typically, a RFP is released to the public at a designated date and time.  Obtaining RFP documents and/or work products prior to that date to one or select group of competitors could affect the integrity of the competitive process.

9.  The RFP files located by JACKSON and ALITERY are currently under development by OCIO and the Office of Chief Financial Officer (hereinafter, OCFO).  The RFP process is for the solicitation of a new firm fixed priced Managed Services IT capability to support ED's internal and external customers, specifically the ED Network (hereinafter, EDNET).  EDNET provides access to e-mail, Internet connectivity, the ED Intranet, and most other systems in use at ED.  This new Managed Services IT contract is expected to be worth a reported $687 million over ten years.

10. Currently, ED IT infrastructure services are supported through a multi-faceted contract including a fixed price portion and specific vehicles involving both fixed priced projects and

time and material activities. CSC currently holds the contract to provide IT infrastructure services to ED.  As the current EDNET contractor, CSC personnel provide IT services including network, project and security support to ED.  CSC is expected to be one of the companies bidding for the contract, thus creating a potential unfair competitive advantage over their competitors for being awarded this contract.

11. ED is currently in the process of determining how to move forward with this RFP process and how to mitigate the disclosure of these sensitive contract files by CSC employees.

**EVIDENCE SUPPORTING PROBABLE CAUSE**

Based upon my training, experience and participation in this and other computer crime investigations that involve ED, I am aware of the following facts:

12. On February 21, 2007, an individual requesting confidentiality (hereinafter, SOURCE) advised the affiant of an incident involving the potential unauthorized access of an OCIO network folder.  The SOURCE has previously provided your affiant and TCD with information which has been independently verified to be truthful and reliable.  SOURCE advised TCD that CSC employees located a folder on EDNET, named "Brainstorm Docs" which contained sensitive contract information.  These files consisted of word processing documents and spreadsheets pertaining to the upcoming RFP for EDNET.  SOURCE advised that s/he was aware that permissions to this folder were originally set so that only selected OCIO personnel could access this folder, and government contractors were specifically removed as individuals authorized to access this folder.

13. On February 23, 2007, OCIO provided TCD audit logs for the "Brainstorm Docs" folder, including all subfolders and files.  Audit log files are computer files that contain records about system events and status, the activities of users, and anomalous or unauthorized

4

computer usage.  In this instance, these audit logs disclosed when an EDNET user accessed the "Brainstorm Docs" folder and/or subfolders and files.  TCD analyzed these audit logs and determined the names of all EDNET users who accessed the "Brainstorm Docs" folder since the time of its creation on October 26, 2006.

14. Based on interviews of OCIO personnel and the analysis of the audit logs, it appears that on February 15, 2007, an authorized OCIO employee inadvertently changed the permissions on the "Brainstorm Docs" folder so that all EDNET users could access this folder and/or subfolders and files.

15. On February 26, 2007, TCD provided OCIO a listing of the names of the EDNET users who accessed the "Brainstorm Docs" folder.  OCIO in turn provided TCD with the names of the individuals on the list who were CSC employees and who were not authorized to have access to the folder, subfolder, and files.

16.  Based upon interviews, log analysis and computer forensic analysis, it was determined that JACKSON navigated to the "Brainstorm Docs" folder at about 11:32 am on February 21, 2007.  From about 11:43 am, until about 12:24 pm, JACKSON opened approximately 15 files located in the "Brainstorm Docs" folder and its subfolders.  At about 11:58 am, she called ALTIERY at his cubicle in PCP and had about an eight minute conversation. JACKSON currently works at the Education Data Center (hereinafter, EDC) at Oxon Hill, Maryland.  ALTIERY also has a cubicle at EDC, but has been and is currently working in PCP.

17. On February 26, 2007, ALTIERY's ED issued desktop computer was forensically imaged by TCD.

18. The forensic analysis of ALTIERY's ED desktop computer conducted by TCD,

determined that ALTIERY began accessing files in the "Brainstorm Docs" folder at about 12:05 pm, which would indicate that ALTIERY began looking in the "Brainstorm Docs" folder and/or its subfolders while on the phone with JACKSON. ALTIERY accessed about 14 documents from about 12:05 pm until about 1:22 pm. Correlation between the audit logs and the forensic analysis show that at around 12:17 pm, ALTIERY stopped accessing the "Brainstorm Docs" folder and/or its subfolders. On the same day around 1:09 pm, ALTIERY began to further look through the files located in the "Brainstorm Docs" folder and its subfolders. At about 1:15 pm, ALTIERY plugged a SanDisk Cruzer Mini USB thumb drive into his ED desktop computer. Forensic analysis on ALTIERY's desktop computer shows that this was the first time that this SanDisk Cruzer Mini USB thumb drive had been plugged into his system. Since May of 2006, ALTIERY has only used two other thumb drives on his ED desktop computer on three dates, with last use on August 23, 2006.

   *A USB thumb drive is defined as: "A small, portable flash memory card that plugs into a computer's USB port and functions as a portable hard drive. USB flash drives are touted as being easy-to-use as they are small enough to be carried in a pocket and can plug into any computer with a USB drive. USB flash drives have less storage capacity than an external hard drive, but they are smaller and more durable because they do not contain any internal moving parts."*

19. Based on my training and experience, I know that USB thumb drives are frequently used to store, as well as transport data from one computer to another. Because of the size of the USB thumb drive, they are easily transportable and concealable, and are often carried by individuals on their person, either in a pocket or around their neck on a lanyard.

20. On March 1, 2007, your affiant conducted an interview with the SOURCE who advised that

ALTIERY is frequently seen carrying a laptop computer back and forth from work in a laptop carrying case. The SOURCE advised that s/he has observed ALTIERY accessing CSC email using a wireless 'aircard' on his laptop computer, which does not connect to EDNET. Furthermore, the SOURCE advised that another telephone conversation occurred between JACKSON and ALTIERY at about 2:53 pm on February 21, 2007. JACKSON re-contacted ALTIERY at PCP from a vacated office in EDC and told him that they needed to tell someone about the folder. ALTIERY essentially told JACKSON not to worry about it, and had an "it never happened" attitude about the situation. The SOURCE advised TCD that s/he was made aware that ALTIERY called JACKSON later that evening and gave JACKSON the "third-degree". The SOURCE advised that the next day, JACKSON made an unsuccessful attempt to gain access to the folder. After this attempt, JACKSON became aware that access permissions to this folder were corrected, and she no longer had access.

21. The affiant knows through reviewing building access logs and computer audit logs for February 21, 2007, that ALTIERY was in his cubicle in Potomac Center Plaza and logged into his ED Workstation during the times the RFP files were accessed.

22. On March 1, 2007, TCD provided a listing of the directories and files accessed by ALTIERY and JACKSON to James HAIRFIELD (hereinafter, HAIRFIELD), Supervisory Contract Specialist, OCFO. HAIRFIELD compared the list of accessed files with the contents of the "Brainstorm Docs" folder, and provided your affiant with listings that identified with the level of sensitivity of each file. Some of the files were 'publicly available' or 'private, but non-sensitive', but there were three documents identified by HAIRFIELD as 'contract sensitive' and listed below:

- *SLA IGCE worksheet for Jeff Brownell 12052006 ver7.xls*
- *00-00-IGCE Final-20070212.xls*

7

- *AEIOU Assignment status-20061208.xls*

HAIRFIELD advised that the files labeled "IGCE" were the Independent Government Cost Estimates for the RFP. HAIRFIELD advised that because the files were obtained by a potential bidder, ED would have to consider making the cost estimates public, as to mitigate this disclosure. Each of the sensitive files identified by HAIRFIELD were accessed by both JACKSON and ALTIERY.

23. On March 6, 2007, HAIRFIELD requested clarifying information from ELDERKIN regarding this incident. ELDERKIN advised in an e-mail: "While searching through the shared folder for an appropriate place to post the inventories, Ms. Jackson discovered a document that appeared to be a Department of Education RFP. She did not review the document but brought its posting to the attention of George Altiery." Further, ELDERKIN advised that ALTIERY brought this activity to her attention on the afternoon of February 22, 2007.

24. Based on ELDERKIN's response, it is your affiant's belief that that ALTIERY was not truthful in his disclosure to ELDERKIN, and failed to disclose to ELDERKIN that JACKSON had opened 15 separate files and that ALTIERY himself had opened 14 separate files. Your affiant believes that ALTIERY was aware that his actions could result in the termination of his employment at CSC. Your affiant believes that the disclosure by ALTIERY to CSC only occurred after he and JACKSON learned that full file auditing was turned on in the "Brainstorm Docs" folder and/or its subfolders. Based on JACKSON's failed access attempt on February 22, 2007, your affiant believes JACKSON realized her unauthorized access to the "Brainstorm Docs" folder and/or its subfolders had been identified and terminated by ED.

25. On March 7, 2007, Glenn PERRY (hereinafter, PERRY), Senior Procurement Executive, ED, advised TCD that at the time the RFP documents were discovered by JACKSON AND ALTIERY, CSC was not formally aware that ED did not plan to exercise the additional one-year option on its contract that expires on July 1, 2007. CSC had only become aware of this information due to the disclosure by JACKSON and ALTIERY. Further, PERRY advised that ED had not made public the fact that the EDNET contract would be open for re-competition. PERRY advised that due to the disclosure of RFP documents to a potential bidder, whether sensitive or non-sensitive, the access to the documents by JACKSON and ALTIERY will cast a "taint" over the entire award process and increase the likelihood of a protest after award. PERRY advised that if ED has to make the Independent Government Cost Estimate (hereinafter, IGCE) available to all bidders, it could potentially mislead those bidders into believing that the amount on the IGCE is what is available to be spent by ED. PERRY believes that disclosure of the IGCE will serve as a deterrent from honest assessments by bidders, and that all bids will "hover" around the IGCE amount.

26. Based upon my training, knowledge and experience with white collar fraud and computer crime cases, the amount of files accessed by JACKSON and ALTIERY appear to be more than an "inadvertent" look and would indicate exceeding authorized access on EDNET. Further, the files accessed were of an economic value to JACKSON and ALTIERY due to the fact the information would advise their employer as to ED's intention to re-compete the EDNET contract and would provide CSC a competitive advantage in the bidding process. The information could also be used as leverage for employment by JACKSON and ALTIERY if taken to another competitor who planned on bidding on the EDNET contract, which is worth a reported $687 million.

27. Given their positions, both JACKSON and ALTIERY should be knowledgeable about the RFP and government contracting processes and how their repeated navigation through the "Brainstorm Docs" folder and/or its subfolders indicate that they knew that these particular files contained sensitive information pertaining to the re-competition of a contract for which their employer, CSC, was planning to compete.

### **CONCLUSION**

The information contained in this affidavit provides probable cause to believe that ALTIERY, violated Title 18, U.S.C. § 1030 through these exceeding authorized accesses, and violated Title 18, U.S.C. § 641, by potentially accessing and copying the contents of "Brainstorm Docs" folder and/or its subfolders to a USB thumb drive.  Based on my training and experience, and the information and evidence gathered in the course of this investigation, your affiant expects to find evidence that ALTIERY copied the files from the "Brainstorm Docs" folder and/or it's subfolders to the SanDisk Cruzer Mini USB thumb drive.  Your affiant further believes that the SanDisk Cruzer Mini USB thumb drive will be located in or near the cubicle office used by ALTIERY, or on his person.


_____
Robert D. Mancuso, Special Agent
United States Department of Education
Office of Inspector General
Technology Crimes Division

Sworn to before me and subscribed in my presence this  _____ day of March, 2007.


_____
HONORABLE MAGISTRATE JUDGE

## ATTACHMENT A

The cubicle office of GEORGE ALTIERY in the Department of Education, at 550 12th Street SW, Room 9094, Washington DC 20202, or on the physical person of GEORGE ALTIERY or any containers in his immediate control.

A physical description of the cubicle office is: a 9th floor cubicle with the room number "9094" and the names of "Jerry Ryznar" and "George Altiery", located on the front of the cubicle. To the left of the entrance of cubicle "9094" is a LCD computer monitor, with a desktop computer stationed behind it. GEORGE ALTIERY uses the workspace area to the left of the entrance to the cubicle.

**ATTACHMENT B**

ITEMS TO BE SEIZED

Based on the forgoing, I respectfully submit that there is probable cause to believe the following items, which constitute evidence of violations of Title 18 U.S.C Sections 1030 (Exceeding Authorized Access) and 641 (Theft of U.S. Government Property), will be found at at 550 12th Street SW, Room 9094, Washington DC 20202:

A. A SanDisk Cruzer Mini USB thumb drive.

B. Any documents and/or information relating to the copying, receipt, transmission, or unlawful accessing of United States Department of Education contract records relating to the Request for Proposal for EDNET Services.